**Kenneth W. ABBOTT, et al, Plaintiffs,**

v.

**BP EXPLORATION AND PRODUCTION INC., et al, Defendants.**

**Civil Action No. H–09–1193.**

United States District Court,
S.D. Texas,
Houston Division.

March 15, 2011.

454

David L. Perry, Rene M. Haas, Perry Haas PC, Corpus Christi, TX, Mikal C. Watts, Watts Guerra Craft LLP, San Antonio, TX, Christopher V. Goodpastor, Watts Guerra et al., Austin, TX, Edward A. Mallett, Mallett & Saper, L.L.P., Rachel Gail Candelet, Watts Guerra Craft LLP, Jill Ondrejko Venezia, Office of U.S. Attorney, Houston, TX, Joyce Branda, Dept. of Justice, Washington, DC, for Plaintiffs.

Otway B. Denny, Jr., Anne M. Rodgers, Christopher Brian Watt, Daniel M. McClure, Katherine Dudas MacKillop, Fulbright Jaworski LLP, Lynne Liberato, Haynes Boone, LLP, Houston, TX, L. Poe Leggette, Fulbright & Jaworski LLP, Washington, DC, Peter Andrew Stokes, Fulbright & Jaworski, Austin, TX, Sarah Rae Teachout, Haynes & Boone LLP, Dallas, TX, for Defendants.

## *MEMORANDUM OPINION AND ORDER*

KENNETH M. HOYT, District Judge.

### I. Introduction

Pending before the Court is the defendants', BP Exploration and Production Inc., BP America Inc., BP p.l.c., and BP Products North America Inc. (collectively, "BP"), motion to dismiss the plaintiffs' amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(6), 9(b), and 12(b)(7) (Docket Entry No. 56). The plaintiffs, United States of America *ex relatione* Kenneth W. Abbott, Kenneth W. Abbott individually, and Food & Water Watch, Inc. ("FWW"), filed a response in opposition (Docket Entry No. 58), to which BP filed a reply (Docket Entry No. 59) and a notice of supplemental authority in support of its motion (Docket Entry No. 60).[1] After having carefully reviewed the motion, the responses and the applicable law, the Court denies BP's motion in its entirety.[2]

---

**1.** The United States filed a statement of interest in response to the BP's motion (Docket Entry No. 69), to which BP responded (Docket Entry No. 74). The plaintiffs responded to BP's response to the United States (Docket Entry No. 81).

**2.** While considering this motion to dismiss, the Court will not address the recent letter

## II. Factual Background

The plaintiffs are seeking to enjoin BP's ability to drill for and produce oil and gas at its Atlantis facility until BP corrects its alleged lack of compliance with various federal environmental and safety regulations. The plaintiffs also seek to recover billions of dollars in oil and gas revenue from BP, alleging that BP unlawfully acquired that revenue by falsely certifying to the Department of the Interior ("DOI") that BP was in compliance with various federal regulations. The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331, 43 U.S.C. § 1349(a), and 31 U.S.C. § 3732(a).

Abbott was formerly employed through a third-party employment company at Atlantis' administrative offices in Houston, Texas, during which time he served as a project control supervisor. His responsibilities included supervising, auditing and managing BP databases to ensure the existence of critical Atlantis documentation. FWW is a national, non-profit, public interest consumer advocacy organization that supports environmental protection and the longterm well-being of coastal fishing communities.

Atlantis is located upon leases that BP obtained from the DOI, pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1344, *et seq.* ("OCSLA") on the Outer Continental Shelf ("OCS"), approximately 190 miles south of New Orleans, Louisiana. Atlantis is located in water

depths ranging from approximately 4400 to 7200 feet, and it began production around October 2007. It is rated to produce 200,000 barrels of oil per day and 180,000,000 cubic feet of gas per day.

The government issued five leases to BP for the land underlying Atlantis, granting BP the "exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the [OCS] . . . subject to the [OCSLA]; [and] all regulations issued pursuant to the Act." Before BP could "produce the oil and gas contained within the lease area," it had to construct the structures necessary to safely withdraw that oil and gas from the OCS. Pursuant to regulations incorporated into the leases, BP's construction efforts had to comply with health, safety and environmental requirements and to provide certifications of compliance to obtain certain approvals from the DOI, through the agency formerly known as the Minerals Management Service ("MMS").[3] The MMS promulgated these regulations pursuant to its authority granted by the DOI.[4]

## III. Contentions of the Parties

### A. BP's Contentions

BP contends that the plaintiffs' False Claims Act ("FCA") claim should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6), because they have not pled a false claim for money or property

---

from BP (Docket Entry No. 84), nor the plaintiffs' letter in response (Docket Entry No. 86), because these letters concern matters outside the scope of the pleadings. *See Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir.2000); *Scanlan v. Texas A & M University*, 343 F.3d 533, 536 (5th Cir.2003) ("In determining whether to grant a motion to dismiss, the district court must not go outside the pleadings and must accept all well-pleaded facts as true." (internal citations omitted)).

**3.** *See* 30 C.F.R. §§ 250.904(a)-(b); 30 C.F.R. § 250.903; 30 C.F.R. § 250.800. As of June 21, 2010, the MMS was renamed the Bureau of Ocean Energy Management, Regulation, and Enforcement. Because the vast majority of activity giving rise to this suit took place while the agency was named the MMS, the Court refers to it as the MMS in this memorandum opinion and order.

**4.** *See* 30 C.F.R. § 250.101.

under the FCA. Alternatively, BP contends that post-lease regulatory non-compliance is not a material claim for property under the FCA. BP also maintains that the plaintiffs' FCA claims should be dismissed under Rule 9(b), because those claims have not been pled with specificity and because they have failed to plead a fraudulent certification on which a government payment was expressly conditioned.

BP avers that the plaintiffs fail to state a claim for injunctive relief for OCSLA violations because the plaintiffs: (1) cannot ask the Court to enforce OCSLA regulations; (2) have failed to join an indispensible party in violation of Federal Rule of Civil Procedure 12(b)(7); (3) lack standing to seek an injunction; and (4) cannot meet the requirements for an injunction. BP requests that this Court dismiss the case in its entirety and with prejudice.

### B. The Plaintiffs' Contentions

The United States *ex rel.* Abbott asserts that BP violated the FCA by knowingly submitting—and then attempting to fraudulently conceal—false documents to obtain oil and gas that was government property. *See* 31 U.S.C. § 3729(a)(1)-(2). He claims that his allegations, taken as true, state violations of the FCA because only through BP's material, false certifications could it obtain oil and gas from the OCS.[5] On behalf of the government, he seeks damages in the amount of the value of property taken, which he believes to be at least ten billion dollars minus any royalties

previously paid, treble damages, civil penalties estimated to be at least thirty billion dollars pursuant to 43 U.S.C. § 1350, and attorneys' fees and expenses.

Abbott individually and FWW claim that BP violated the OCSLA by failing to adhere to MMS safety and environmental regulations, including the platform approval and verification programs, the production safety systems and the oil response plan.[6] Abbott individually and FWW seek injunctive relief under the OCSLA until BP complies with all applicable regulations and agreements. They allege that: (1) they meet the requirements for standing; (2) OCSLA's citizen suit provision authorizes any legally interested entity to raise a claim to compel compliance with OCSLA and MMS regulations; (3) the DOI is not a necessary party;[7] and (4) the plaintiffs have stated a claim upon which injunctive relief may be granted. The plaintiffs assert that they have legally cognizable interests in the protection, preservation and enhancement of the Gulf of Mexico environment, and that BP's alleged violations create an imminent risk of harm to their legal interests. The plaintiffs also request that—if the Court finds their current complaint insufficient—that they be given the opportunity to re-plead.[8]

### IV. Standards of Review

#### A. Rule 12(b)(6) Standard

A defendant may to move to dismiss a plaintiff's complaint for "failure to state a

---

**5.** The United States agrees that false statements made in MMS permit applications can implicate the FCA.

**6.** Abbott avers that he has direct and independent knowledge of information forming the basis of this suit and that he has complied with 31 U.S.C. § 3730(b)(2) by providing a written disclosure of substantially all material evidence and information in his possession to the DOI Inspector General and to representatives of the Department of Justice. Abbott

individually and FWW assert that on July 1, 2010, they complied with 43 U.S.C. § 1349 by giving the requisite parties notice of the alleged OCSLA violations.

**7.** The United States agrees that the DOI is not a necessary party with respect to the plaintiffs' OCSLA claim.

**8.** Because the Court is ruling in favor of the plaintiffs, the Court need not address the plaintiffs' conditional request to replead.

claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6). Under the requirements of a Rule 12(b)(6) motion, "[t]he plaintiff's complaint is to be construed in a light most favorable to the plaintiff, and the allegations contained therein are to be taken as true." *Oppenheimer v. Prudential Sec., Inc.,* 94 F.3d 189, 194 (5th Cir.1996) (citing *Mitchell v. McBryde,* 944 F.2d 229, 230 (5th Cir. 1991)). Dismissal is appropriate only if, the "[f]actual allegations [are not] enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations omitted). Moreover, in light of Federal Rule of Civil Procedure 8(a)(2), "[s]pecific facts are not necessary; the [allegations] need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (*per curiam* ) (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). Even so, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly* at 555, 127 S.Ct. 1955 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).

More recently, in *Ashcroft v. Iqbal,* the Supreme Court expounded upon the *Twombly* standard, reasoning that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly* at 570, 127 S.Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft,* 129 S.Ct. at 1949 (citing *Twombly* at 556, 127 S.Ct. 1955). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Ashcroft* at 1950 (quoting FED. R. CIV. P. 8(a)(2)). Nevertheless, when considering a 12(b)(6) motion to dismiss, the Court's task is limited to deciding whether the plaintiff is entitled to offer evidence in support of his claims, not whether the plaintiff will eventually prevail. *See Twombly* at 563 n. 8, 127 S.Ct. 1955 (citing *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (overruled on other grounds)); *see also, Jones v. Greninger,* 188 F.3d 322, 324 (5th Cir.1999).

**B. Rule 9(b) Standard**

A dismissal for failure to plead fraud with particularity pursuant to Federal Rule of Civil Procedure (9)(b) is treated the same as a Rule 12(b)(6) dismissal for failure to state a claim. *See Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1017 (5th Cir.1996) (citing *Shushany v. Allwaste, Inc.,* 992 F.2d 517, 520 (5th Cir. 1993)). Rule 9(b) states that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). The particularity required for such pleading, however, varies from case to case. *See Benchmark Elecs., Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 724 (5th Cir.2003), *modified on other grounds,* 355 F.3d 356 (5th Cir.2003). The Fifth Circuit reasoned that "[a]t a minimum, Rule 9(b) requires allegations of the particulars of time, place, and contents of the false representations, as well as the

identity of the person making the misrepresentation and what he obtained thereby." *Benchmark Elecs.*, 343 F.3d at 724 (citing *Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992) (internal quotation marks and citation omitted)); *see also, Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir.2004). More precisely, Rule 9(b)'s particularity requirement compels that "the who, what, when, where, and how [ ] be laid out." *Benchmark Elecs.*, 343 F.3d at 724 (citing *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir.1997)); *see also, Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir.2001) (noting that "Rule 9(b) applies by its plain language to all averments of fraud, whether they are part of a claim of fraud or not.").

### C. Rule 12(b)(7) Standard

Federal Rule of Civil Procedure 12(b)(7) authorizes the dismissal of an action for "failure to join a party under Rule 19." "Rule 19 provides for the joinder of all parties whose presence in a lawsuit is required for the fair and complete resolution of the dispute at issue." *HS Resources, Inc. v. Wingate*, 327 F.3d 432, 438 (5th Cir.2003) (citing FED. R. CIV. P. 19(a); *Pulitzer–Polster v. Pulitzer*, 784 F.2d 1305, 1308 (5th Cir.1986) (internal quotation omitted)). "It further provides for the dismissal of litigation that should not proceed in the absence of parties that cannot be joined." *Wingate*, 327 F.3d at 438 (citing FED. R. CIV. P. 19(b); *Pulitzer–Polster*, 784 F.2d at 1308). Pursuant to Rule 19, an entity, subject to service of process, and whose joinder will not deprive the court of subject-matter jurisdiction must be joined if:

> (A) in that [entity's] absence, the court cannot accord complete relief among existing parties; or
> (B) that [entity] claims an interest relating to the subject of the action and is so

situated that disposing of the action in the [entity's] absence may:

> (i) as a practical matter impair or impede the [entity's] ability to protect the interest; or
> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

FED. R. CIV. P. 19(a)(1).

■ If an entity who qualifies under Rule 19(a)(1) cannot be joined, the district court must ascertain "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." FED. R. CIV. P. 19(b). Factors the district court must consider in making its determination include the following:

> (1) the extent to which a judgment rendered in the [entity's] absence might prejudice that [entity] or the existing parties;
> (2) the extent to which any prejudice could be lessened or avoided by:
>> (A) protective provisions in the judgment;
>> (B) shaping the relief; or
>> (C) other measures;
> (3) whether a judgment rendered in the [entity's] absence would be adequate; and
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for non-joinder.

*Id.* "In ruling on a motion to dismiss for failure to join a necessary and indispensable party, a court must accept the complaint allegations as true." *United States v. Rutherford Oil Corp.*, No. G–08–0231, 2009 WL 1351794, at *2 (S.D.Tex. May 13, 2009) (citing *Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 479 n. 2 (7th Cir. 2001)).

■ Moreover, the burden of proof remains on the moving defendant to demonstrate "that an absent party is indispensable and that the action should be dismissed." *SMI–Owen Steel Co., Inc. v. St. Paul Fire & Marine Ins. Co.,* 199 F.R.D. 209, 211 (S.D.Tex.2001) (citing *Nottingham v. General Am. Communications Corp.,* 811 F.2d 873, 880 (5th Cir. 1987)). Nevertheless, "when an initial appraisal of the facts indicates that a possibly necessary party is absent, the burden of disputing this initial appraisal falls on the party who opposes joinder." *Pulitzer–Polster,* 784 F.2d at 1309 (citing *Boles v. Greeneville Housing Authority,* 468 F.2d 476, 478 (6th Cir.1972)).

## V. Analysis and Discussion

The Court denies BP's motion to dismiss in its entirety. BP's right to extract oil and gas from the OCS is predicated upon its compliance with its leases' contractual provisions. Those contractual provisions require: (1) compliance with "all regulations issued pursuant to [the OCSLA];" (2) that all platforms and "other devices permanently or temporarily attached to the seabed" adhere to "applicable laws and regulations;" and (3) that "[t]he Lessee [ ] comply with all regulations and Orders." [9] Applicable regulations demand that production equipment be designed by qualified engineers, meet specified engineering requirements, and include "as-built" documentation upon which others can rely in, for example, times of disaster. Abbott, while working for BP after it began production at Atlantis, alleges learning that multiple BP engineering documents lacked the "as-built" engineering approvals necessary for government certifications—certifications without which BP was not entitled to produce oil and gas. The plaintiffs' averments that BP was required to guarantee that these certifications existed, and that BP fraudulently did so, are sufficient to survive this stage of adjudication for the reasons that follow.

### A. The Plaintiffs' FCA Claim

■ The Court denies BP's motion to dismiss the plaintiffs' FCA claim pursuant to Rule 12(b)(6) because the Court finds that the plaintiffs' allegations, taken as true, state FCA violations. The FCA broadly imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," thereby depriving the government of money or property. 31 U.S.C. § 3729(a)(1)(A). The relevant questions before the Court are definitional: (1) what is a "claim;" and (2) what is "material"?

#### 1. What is a "Claim"?

■ The FCA defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property ... if the United States Government [ ] provides or has provided any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2). The FCA covers "all fraudulent attempts to cause the Government to pay out sums of money [or property]." *United States v. Neifert–White Co.,* 390 U.S. 228, 233, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968). The FCA's scope is wide, and "aims to impose liability for a broad range of conduct." *United States ex rel. Quinn v. Omnicare Inc.,* 382 F.3d 432, 439 (3d Cir.2004).[10]

---

**9.** BP and the MMS executed five leases covering the Atlantis region. The five leases contain identical contractual requirements.

**10.** This "broad range of conduct" has included: (1) overbilling on Medicare invoices in

*United States v. Krizek,* 111 F.3d 934, 940 (D.C.Cir.1997); and (2) submitting false qualifications for a government job in *United States v. Johnston,* 138 F.Supp. 525, 527 (W.D.Ok. 1956).

Furthermore, "where the government has conditioned payment of a claim upon a claimant's certification of compliance with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir.1997).[11]

This understanding of a false claim comfortably encompasses misrepresentations in some permits that a lessee submits in seeking the right to drill for or develop oil on a federal OCS lease. An OCS lease, standing alone, does not transfer to the lessee the rights to explore, develop or produce oil and gas resources. *See Sec'y of the Interior v. California*, 464 U.S. 312, 338, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984) (*superseded on other grounds*); *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 609–10, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000). "[A]t least since 1978 the sale of a lease has been a distinct stage of the OCS administrative process, carefully separated from the issuance of a federal license or permit to explore for, develop, or produce gas or oil on the OCS." *Sec'y of the Interior* at 336, 104 S.Ct. 656.[12] The Supreme Court stated that, "[i]f the distinction between a sale of a 'lease' and the issuance of a permit to 'explore for,' 'produce,' or 'develop' oil or gas seems excessively fine, it is a distinction that Congress has codified with great care." *Id.* at 335–36, 104 S.Ct. 656.

Here, the plaintiffs attempt to employ the FCA to recover the value of the oil and gas (and the associated penalties) from BP, claiming that BP fraudulently obtained that oil and gas from the government.[13] BP's leases, standing alone, do not give rise to property rights in the oil and gas minerals themselves. BP misconstrues the relationship between its leases and its MMS permits by contending that any misrepresentations in such permits

**11.** In *Thompson,* the Fifth Circuit reversed the lower court's dismissal of an express false certification claim because Thompson pled that: (1) the government's payment of Medicare claims is conditioned upon certification of compliance with the laws and regulations regarding the provision of health care services; and (2) the defendants submitted false claims by falsely certifying that the services identified in their annual cost reports were rendered in compliance with such laws and regulations. *Thompson,* 125 F.3d at 902.

Here, the plaintiffs have pled that: (1) the government's approvals of the production safety system application and platform installation application—both prerequisites to obtain production of government oil and gas—are conditioned upon BP's certification of compliance with OCSLA regulations; and (2) BP's certifications, required by the regulations, were false. Under *Thompson,* the plaintiffs have sufficiently pled a false claim pursuant to the FCA. *See Thompson* at 902.

**12.** The Supreme Court went on to describe the four distinct statutory stages of developing an offshore well:

(1) formulation of a 5–year leasing plan by the [DOI]; (2) lease sales; (3) exploration by the lessees; (4) development and production. Each stage involves separate regulatory review that may, but need not, conclude in the transfer to lease purchasers of rights to conduct additional activities on the OCS.

*Id.* at 337. The Supreme Court then elaborated on the lease sale stage, stating that:

Under the plain language of the OCSLA, the purchase of a lease entails no right to proceed with full exploration, development, or production ...; the lessee acquires only a priority in submitting plans to conduct those activities. If these plans, when ultimately submitted, are disapproved, no further exploration or development is permitted.

*Id.* at 339.

**13.** The FCA authorizes an individual to bring claims on behalf of the government if the individual is the "original source" of the information on which the FCA allegations are based. 31 U.S.C. § 3730(e)(4)(B).

are outside the FCA's ambit because such permits were submitted after the issuance of BP's leases. While each lease does convey "the exclusive right and privilege to drill for, develop, and produce oil and gas resources," each lease also mandates that:

> The lease is issued subject to the [OCSLA]; all regulations issued pursuant to the [OCSLA;] ... all regulations issued pursuant to the statute in the future which provide for the prevention of waste and conservation of the natural resources of the [OCS] and the protection of correlative rights therein; and all other applicable statutes and regulations.

■ The Supreme Court has determined that regulatory approvals are conditions precedent to extracting oil and gas:

> [T]he lease contracts gave the companies more than rights to obtain approvals. They also gave the companies rights to explore for, and to develop, oil. But the need to obtain Government approvals so qualified the likely future enjoyment of the exploration and development rights that the contract, in practice, amounted primarily to an *opportunity* to try to obtain exploration and development rights in accordance with procedures and under the standards specified in the cross-referenced statutes and regulations. Under the circumstances, if the companies did not at least buy a promise that the Govern-

ment would not deviate significantly from those procedures and standards, then what did they buy? (the companies bought exclusive rights to explore and develop oil *'if they met'* OCSLA requirements).

*Mobil Oil,* 530 U.S. at 620–21, 120 S.Ct. 2423 (internal citation omitted); *see also, Sec'y of the Interior,* 464 U.S. at 339, 104 S.Ct. 656. Thus, although leases do convey valuable rights to oil companies, they do not exempt the companies from the duty of complying with the continuing obligations set forth in the leases, statutes and regulations.[14]

Furthermore, multiple circuit courts have rejected BP's position that an OCS lease grants the lessee an unfettered property interest in its lease. For example, the Ninth Circuit stated that "[a] lease issued under [the OCSLA] ... does not convey title in the land, nor does it convey an unencumbered estate in the oil and gas. The lease does convey a property interest enforceable against the Government, of course, but it is an interest lacking many of the attributes of private property." *Union Oil Co. of California v. Morton,* 512 F.2d 743, 747 (9th Cir.1975) (internal citations omitted). Additionally, the Fifth Circuit stated, in the context of a lease under the Mineral Leasing Act of 1920, that "[a] mineral lease does not give the lessee anything approaching full ownership of a fee

---

**14.** *Compare United States ex rel. Augustine v. Century Health Services,* 289 F.3d 409 (6th Cir.2002). The *Augustine* court held that a defendant home health care agency and its officers could violate the FCA by submitting fraudulent costs reports to the Medicare program even if those cost reports were not false when submitted, as long as the defendants had a continuing duty to comply with the regulations upon which payment was conditioned. *Augustine,* 289 F.3d at 415 ("liability can attach if the claimant violates its continuing duty to comply with the regulations upon which payment is conditioned.").

Likewise, BP's rights under its leases to drill for and develop oil were expressly conditioned on it obtaining critical permits designed to ensure the safety and efficacy of any drilling and production activities. The government's authority to require these permits is granted by statute and incorporated into the leases. Thus, if BP made misrepresentations material to the approval of any such permits, then BP violated its lease terms and rendered the lease false for FCA purposes.

patentee, nor does it convey an unencumbered estate in the minerals." *McKenna v. Wallis*, 344 F.2d 432, 440–41 (5th Cir. 1965).

Thus, the leases do not grant BP a fee simple ownership of the oil and gas itself. BP could not fully exercise its rights to drill for and produce oil until it received the necessary additional permits and approvals that certified the existence of various engineering documents imperative to the safe functioning of its installed mechanisms.[15] The permit and approval process is required because the mechanisms used to achieve production, *i.e.*, the structures and components that ensure the safe removal of oil and gas, are necessary predicates to the production of oil and gas. *Mobil Oil*, 530 U.S. at 609, 120 S.Ct. 2423. Therefore, the issuance of a lease begins, rather than ends, the process by which BP may exercise the right to explore for and extract oil or gas by way of its OCS leases. This process includes critical government permits that effectuate the lessee's right to drill for and develop oil from a federal lease, and thus these permits can constitute actionable "claim[s] ... for ... property" under the FCA. 31 U.S.C. § 3729(b)(2).

BP's heavy reliance on one case for the proposition that its leases granted it a property interest in the Atlantis oil and gas is unjustified because that case is distinguishable for multiple reasons. *See United States ex rel. Marcy v. Rowan Cos., Inc.*, 520 F.3d 384 (5th Cir.2008).[16] First, in *Marcy*, the only claim identified by the relator was the lease, whereas here the plaintiffs have alleged other potential claims for government property to which the alleged false statements may be material. *See id.* at 387. Second, *Marcy* did not involve permit applications, which are prerequisites to a lessee's right to drill for and produce oil from the OCS.[17] The plaintiff in *Marcy* sought to recover for implied false certifications of compliance with the lease, whereas the present plaintiffs seek to recover for BP's allegedly false certifications of compliance with regulations required for the production of oil and gas.

---

**15.** *See* 30 C.F.R. §§ 250.293, 250.800, 250.903–905, 250.917(a).

**16.** *Marcy* involved allegations by an offshore rig worker that his employer dumped oil and other hazardous substances into the sea in violation of federal law, and that such conduct constituted a violation of the FCA. *Marcy*, 520 F.3d at 387. The relator's theory was that illegally dumping hazardous substances violated the lease, and that the defendants impliedly certified that they would comply with the lease. *Id.* at 388. In dismissing the relator's allegations, the Fifth Circuit held that "[b]ecause the environmental requirements that Marcy references were not prerequisites to continuation of the lease, Marcy fails to state a claim under the [FCA]." *Id.* at 390.

**17.** Language from *Marcy* itself supports this finding. The *Marcy* court determined that "when 'the government has conditioned payment of a claim upon a claimant's certifica-

tion with, for example, a statute or regulation, a claimant submits a false or fraudulent claim when he or she falsely certifies compliance with that statute or regulation.'" *Marcy* at 389 (quoting *Thompson*, 125 F.3d at 902).

The Court is not persuaded by BP's reference to *United States ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262 (5th Cir. 2010). BP's argument that the *Steury* opinion requires dismissal of this case ignores the role and function of BP's permit applications. Unlike in *Steury*, where the plaintiff failed to show that an alleged warrant of merchantability on certain medical products was a condition of, or prerequisite for, receiving government funds, here BP was required to obtain permits as a precondition to acquire rights to drill for or develop oil and gas on its leases. *See Steury*, 625 F.3d at 269. The plaintiffs allege that BP made material misrepresentations to obtain such permits. If ultimately proven, then the plaintiffs will have satisfied *Steury*'s condition of payment requirement.

*See Marcy* at 387. Third, the *Marcy* court expressly refused to decide whether that plaintiff had properly identified a valid claim under the FCA. *Id.* at 389 ("We do not decide whether Marcy has properly identified a claim for purposes of Section 3729(a)(2)."). Fourth, as discussed below in Section V(A)(2), the *Marcy* court's unduly narrow definition of "materiality" was subsequently rejected by the Fifth Circuit in *Longhi. See United States ex rel. Longhi v. Lithium Power Tech.*, 575 F.3d 458, 470 (5th Cir.2009).

Even assuming, *arguendo*, that BP is correct that only the leases qualify as claims under the FCA, that still does not justify the dismissal of the plaintiffs' allegations. If BP violated material lease terms, then BP's conduct converted the leases themselves into false claims. The government's authority to require that the permits be incorporated into the leases is granted by statute and regulation. Thus, if BP made misrepresentations material to the approval of any such permit, then BP's actions violated its lease terms, rendering the leases false for FCA purposes.

■ At this stage of the proceedings, the plaintiffs need only show that their averments, when taken as true, show a reasonable inference that BP's alleged false claims constitute FCA violations. The plaintiffs have done this by alleging two specific violations of the FCA: (1) that BP knowingly presented the MMS with a false or fraudulent claim for government payment or approval in violation of 31 U.S.C. § 3729(a)(1); and (2) that BP knowingly made use of a false record to get a false or fraudulent claim paid or approved by the MMS in violation of 31 U.S.C. § 3729(a)(2). The plaintiffs allege that BP committed these FCA violations by making two expressly false certifications to obtain possession of government oil and gas in violation of 30 C.F.R. §§ 250.802(e)(5), 250.905(j), and that the government issued BP a permit to drill for and produce oil and gas based on those false certifications.[18] Accordingly, the Court concludes that the plaintiffs have alleged a "claim" under the FCA.[19]

### 2. What is "Material"?

A knowingly false or misleading representation in MMS permit applications must be material to violate the FCA. 31 U.S.C. § 3729(a)(1)(A). The Court concludes that the plaintiffs have alleged material misrepresentations under the FCA. As mentioned above in Section V(A)(1),

---

**18.** BP claims that the contested certifications were certifications of future compliance that did not trigger FCA liability. The Court disagrees with BP's assertion for two reasons. First, by the time BP started producing oil and gas, its commitments for future compliance, if not fulfilled, had become false statements. Second, neither of courts in the cases that BP cites for its contention found any intent to defraud. *See United States ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F.Supp.2d 487, 503 (S.D.Tex.2003); *United States ex rel. Gay v. Lincoln Tech. Inst., Inc.*, 2003 WL 22474586, at *4 (N.D.Tex. Sept. 3, 2003). Without additional evidence of intent, the claims in those cases failed. Here, unlike in *Graves* and *Gay*, BP has not challenged the sufficiency of the additional facts pled to support an intent to defraud.

**19.** The Court also disagrees with BP's assertion that, because the government has not exercised its discretionary authority to cancel the lease, there is no FCA violation. This position inappropriately limits the FCA's applicability. No OCSLA provision states that discretionary cancellation is the exclusive remedy for fraud, nor does the OCSLA preempt FCA jurisdiction. Rather, a proper false certification claim focuses solely on whether an entity has perpetrated a fraud against the government. *United States ex rel. Sanders v. American–Amicable Life Ins. Co. of Tex.*, 545 F.3d 256, 259 (3d Cir.2008). An FCA plaintiff need not look to the government's possible alternative methods of recovery.

the *Marcy* court's unduly narrow definition of "materiality" was subsequently rejected by the Fifth Circuit in *Longhi*. *Longhi*, 575 F.3d at 470.[20]

In *Longhi*, a *qui tam* plaintiff alleged fraud against the federal Small Business Innovation Research Program. Even though all of the conduct set forth in the *Longhi* relator's complaint occurred in or before 2002, the Fifth Circuit adopted the standard of materiality that the Fraud Enforcement and Recovery Act of 2009 ("FERA") set forth two months before the Fifth Circuit issued its *Longhi* opinion in 2009.[21] As amended by FERA, the FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The Fifth Circuit determined that this FERA standard applies even to cases that involve conduct occurring prior to FERA's enactment. *Longhi* at 470.[22] The Fifth Circuit clarified that the natural tendency test:

> requires only that the false or fraudulent statements either (1) make the government prone to a particular impression, thereby producing some sort of effect, or (2) have the ability to effect the government's actions, even if this is a result of indirect or intangible actions on the part of the Defendants. All that is required under the test for materiality, therefore, is that the false or fraudulent statements have the potential to influence the government's decisions.

*Longhi* at 470.

■ While one Fifth Circuit panel cannot generally overrule the decision of an earlier panel, it is "well established" Fifth Circuit precedent that an exception to that principle exists if the relevant statutory law has changed. *United States v. Krumnow*, 476 F.3d 294, 298 (5th Cir.2007). The FERA amendments to the FCA are just such a relevant change, which provide probative evidence of what Congress deemed material even prior to FERA's enactment. *Steury*, 625 F.3d at 267 (citing *Longhi*, 575 F.3d at 470, for the governing definition of "materiality").

Thus, to evaluate whether BP's permit applications contained any false or misleading statements that were material, the Court must determine whether those statements had a natural tendency to influence, or were capable of influencing, the MMS's decision to approve BP's permits. *See* 31 U.S.C. § 3729(b)(4). Unless and until the permit process was satisfied, BP did not have the lawful right to drill for, or extract, any oil or gas. *See Mobil Oil*, 530 U.S. at 620–21, 120 S.Ct. 2423. Accordingly, false statements made during that process could certainly have had a natural tendency to affect the government's decision to allow BP to explore and develop the leases.

**20.** However, even if the Court applied the *Marcy* standard and required that a falsehood relate to a condition of payment, at least some of the permits submitted by a lessee like BP could satisfy that standard. Hence, BP's contention that the plaintiffs have not alleged a material falsehood would still fail.

**21.** *See* Pub.L. No. 111–21, § 4, 123 Stat. 1617 (2009).

**22.** "If Congress intended materiality to be defined under the more narrow outcome materiality standard, it had ample opportunity to adopt the outcome materiality standard in FERA. Instead, Congress embraced the test as stated by the Supreme Court and several courts of appeals. While we decline to rule on whether this statute applies retroactively or prospectively, we find this enactment to be relevant as to Congress's intent when it enacted the FCA. *See NCNB Texas Nat'l Bank v. Cowden*, 895 F.2d 1488, 1500 (5th Cir.1990) ('[A] legislative body may amend statutory language to make what was intended all along even more unmistakably clear.')" (other internal citation omitted).

■ The plaintiffs allege that BP failed to abide by critical regulations in constructing Atlantis while falsely certifying otherwise.[23] Without those allegedly false certifications, and government approval based on those certifications, BP would never have received authorization to extract oil and gas from the OCS. Put otherwise, the plaintiffs' allegations, taken as true, establish that BP's false certification "ha[d] the potential to influence the government's decision" to approve BP's production at Atlantis. *Longhi* at 470. "[T]he FCA requires proof only that the defendant's false statements 'could have' influenced the government's payment decision or had the 'potential' to influence the government's decision, not that the false statements actually did so." *Longhi* at 469. Therefore, BP's allegedly fraudulent inducement was material to the government's decision to permit BP to operate Atlantis.

## B. BP's Rule 9(b) Motion

■ The Court denies BP's motion to dismiss pursuant to Federal Rule of Civil Procedure 9(b), because the Court determines that the plaintiffs have pled fraud with sufficient particularity. Rule 9(b) does not operate in isolation, but should rather be read "as part of the entire set of rules, including Rule 8(a)'s insistence upon 'simple, concise, and direct' allegations." *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir.1997).

Furthermore, the Fifth Circuit recently concluded that "the 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b). Rather, the rule is context specific and flexible and must remain so to achieve the remedial purpose of the [FCA]." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 188 (5th Cir.

2009). Because of Rule 9(b)'s remedial purpose, the Fifth Circuit has opted to:

reach for a workable construction of Rule 9(b) with complaints under the [FCA]; that is, one that effectuates Rule 9(b) without stymieing legitimate efforts to expose fraud. We hold that to plead with particularity the circumstances constituting fraud for a [FCA] § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.

*Grubbs*, 565 F.3d at 191.

The plaintiffs have met this standard. In their amended complaint, the plaintiffs provide specific descriptions of an alleged chain of events leading to Abbott's purported discovery of documentation deficiencies and his supposed attempts to cure the issue. The plaintiffs' allegations provide the specific dates that Abbott allegedly acquired the knowledge, with whom he spoke, what emails he received and what meetings he attended regarding issues relevant to this dispute. The plaintiffs also identified BP's signatory and the government's permit approval based on BP's certification. These facts, when taken as true, establish that BP lacked the requisite design documents to render its earlier certifications of compliance. Accordingly, the Court finds that the plaintiffs have pled their fraud claim with sufficient specificity and denies BP's Rule 9(b) motion.

## C. The Plaintiffs' OCSLA Injunctive Relief Claim

The Court denies BP's motion to dismiss the plaintiffs' OCSLA claim because the

---

**23.** A false certification "may take many forms, the most common being a claim for goods or services ... provided in violation of contract terms, specification, statute or regulation." *Mikes v. Straus,* 274 F.3d 687, 697 (2d Cir.2001) (emphasis omitted).

Court determines, for the reasons explained below, that: (1) the DOI is not an indispensable party; (2) the plaintiffs have standing to bring this action; and (3) the plaintiffs have stated a permissible claim for injunctive relief.

### 1. Is the DOI an Indispensable Party?

■ The Court determines that the DOI is not an indispensable party and that the Court has subject matter jurisdiction over this dispute. While the Court cannot order the DOI to enforce OCSLA regulations, the DOI does not meet the criteria defining a necessary party under Rule 19(a) for this OCSLA citizen suit. *See* Section **IV(C)**, *supra.*

Under Rule 19(a)(1)(A), the DOI's absence in this suit does not preclude complete relief. This dispute is between the plaintiffs and BP, and the DOI's presence will not affect the determination of whether BP should be forced to comply with MMS regulations because the OCSLA's citizen suit statute expressly provides courts with the authority to make such determinations without mandating DOI participation. 43 U.S.C. § 1349(a)(1) (authorizing "any person having a valid legal interest" to commence an action to "compel compliance . . . against any person . . . for any alleged violation of this subchapter or any regulation promulgated under this subchapter.").[24] In fact, holding the DOI as an indispensable party would undermine the very purpose of citizen suits. *See Baughman v. Bradford Coal Co.,* 592 F.2d 215, 218 (3d Cir.1979), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979) ("Congress intended citizen suits to both goad the responsible agencies to more vigorous enforcement of the antipollution standards and, if the agencies remained inert, to provide an alternate

enforcement mechanism." (internal citation omitted)).

Furthermore, the DOI's interest in its enforcement role under the OCSLA is not impaired by this litigation. On the contrary, the DOI maintains the ability to protect its regulatory authority by intervening as of right. 43 U.S.C. § 1349(a)(4) ("the Attorney General, upon the request of the Secretary or any other appropriate Federal official, may intervene as a matter of right in a citizen suit."). Neither does this plaintiffs' citizen suit prevent the government from pursuing its own claims against BP, nor are the plaintiffs requesting the Court to compel the DOI to take any action. Rather, the plaintiffs have properly commenced a claim under the OCSLA's citizen suit statute to compel BP to comply with MMS regulations specific to engineering documentation requirements, and to enjoin BP from the production of oil and gas at Atlantis until such compliance is assured, because the plaintiffs have a valid legal interest in protecting the environment.

Additionally, the DOI's enforcement authority will not be impaired by the Court's determination of whether BP is violating MMS regulations and whether such alleged violations pose an irreparable harm. *See Ass'n to Protect Hammersley v. Taylor Res.,* 299 F.3d 1007, 1014–15 (9th Cir. 2002). "[A]s a 'general rule' . . . federal and state agencies administering federal environmental laws are not necessary parties in citizen suits to enforce the federal environmental laws." *Hammersley,* 299 F.3d at 1014 (internal citations omitted). The plaintiffs are not asking the Court to review any DOI decision. Even if the DOI concludes its current investigation by de-

**24.** The OCSLA citizen suit provision "permits a private citizen to . . . thus become 'a private attorney general' with regard to OCSLA enforcement." *Nolan v. Bama Const., Inc.,* No.

92–2606(C), 1994 WL 374225, at *2, 1994 U.S. Dist. LEXIS 9527, at *6–7, (internal quotation omitted), *aff'd,* 49 F.3d 728 (5th Cir. 1995).

termining not to pursue enforcement action against BP, this suit can still proceed unaffected. *See id.* Regardless of who compels compliance, BP will only be subject to a single obligation: compliance. As such, the DOI is not a necessary party under Rule 19(a).[25]

Moreover, the OCSLA citizen suit statute does not preclude injunctive relief as a means to achieve compliance or prevent harm until compliance is achieved. *See Hammersley*, 299 F.3d at 1012.[26] Courts are authorized to "compel compliance" of "any person" where the plaintiff maintains a valid legal interest and the person has violated the act or regulation. *Id.* at 1012 ("[I]f [regulatory agencies] decline enforcement, then they have no statutory or common law right to veto environmental review sought by a citizen who has otherwise complied with the [citizen suit statute of the] Act.")

Nor is the DOI a necessary party because of its continuing interest in the ongoing royalty revenues that it receives from Atlantis. To the extent that this interest is implicated, the DOI does not need to be a party to protect it, because the lease provides the DOI with multiple remedies. Specifically, the DOI can seek civil penalties for violations of a lease issued under the OCSLA pursuant to 43 U.S.C. § 1350,

or it can intervene as of right pursuant to 43 U.S.C. § 1349(a)(4).

Regardless of the outcome of the DOI's investigation of Atlantis, the plaintiffs have alleged that BP is in violation of 43 U.S.C. § 1334(a) and that BP is in violation of its government leases—both of which are proper citizen suit claims. Therefore, the Court determines that the DOI is not an indispensable party to this suit.

### 2. Standing

▬▬▬ Article III of the Constitution limits federal courts to the adjudication of actual cases and controversies. *See, e.g., Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Article III standing is a "threshold jurisdictional question." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). To satisfy Article III's standing requirements, a plaintiff must show that he has:

"suffered an injury-in-fact [ ] which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical ... [with a] causal connection [that is fairly traceable] to the challenged action of the defendant ... [and] it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

---

**25.** *See Hammersley*, 299 F.3d at 1014–15 (finding, in a citizen suit action under the Clean Air Act ("CAA"), that "[the state regulatory agency's] absence does not subject [the parties] to any multiple or inconsistent obligations"); *Student Public Interest Research Group of New Jersey, Inc. v. Monsanto Co.*, 600 F.Supp. 1479, 1484 (D.C.N.J.1985) ("[T]he court cannot see what interest of the agencies might be impaired by enforcement of the permits they issued, or how the defendant could be exposed to multiple liabilities.").

**26.** Section 1349(a) is based upon, and "virtually identical" to, the citizen suit provision in the CAA. *North Slope Borough v. Andrus*, 515 F.Supp. 961, 964 (D.D.C.1981), *rev'd for other*

*reasons sub nom. Village of Kaktovik v. Watt*, 689 F.2d 222, 226 (D.C.Cir.1982). Case law interpreting the CAA and statutes with similar provisions establish that federal agencies charged with overseeing environmental statutes are not necessary parties to citizen enforcement actions brought under those statutes. *See Hammersley*, 299 F.3d at 1014; *Sierra Club v. Young Life Campaign, Inc.*, 176 F.Supp.2d 1070, 1078 (D.Colo.2001) ("it has long been settled that federal and state agencies that administer federal environmental programs are not necessary, let alone indispensable, parties to citizen suits to enforce permitting and other federal environmental requirements against alleged violators" (internal citation omitted)).

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotations and citations omitted). If a plaintiff is an organization asserting representative standing under Article III, such standing is achieved when "its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (internal citation omitted). Here, threatened with injury to their interests in the Gulf of Mexico, the plaintiffs maintain standing to seek injunctive relief under the OCSLA.

### a. Injury in Fact

To meet the first prong for standing, the plaintiffs must "have a direct stake in the outcome." *Sierra Club v. Morton,* 405 U.S. 727, 740, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (*superseded on other grounds* ). The plaintiffs need to suffer harm to some aesthetic, environmental or recreational interest. *Sierra Club,* 405 U.S. at 734–35, 92 S.Ct. 1361. "These injuries need not be large, an 'identifiable trifle' will suffice." *Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 71 (3d Cir.1990) (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973)).

The Fifth Circuit has previously found the injury requirement satisfied when an organization, on behalf of its members, sought to prohibit the draining of several ponds. *See Save Our Comm. v. United States EPA,* 971 F.2d 1155, 1160–61 (5th Cir.1992). That organization asserted that "its members resided in the vicinity of or owned property [nearby], and enjoyed 'the wildlife, aesthetics, open space, ecological and other values of the wetlands, … and [were] directly and beneficially interested in the continued protection, preservation, and enhancement of these values.'" *Save Our Comm.,* 971 F.2d at 1160–61.

The plaintiffs maintain interests similar to those recognized in *Save Our Community.* Specifically, Abbott is a Texas native and has a direct interest in the protection, preservation and enhancement of the Gulf of Mexico environment. Further, Abbott and FWW members are "directly and beneficially interested in the continued protection, preservation and enhancement of" values derived from the Gulf of Mexico environment. *Save Our Community,* 971 F.2d at 1161. These interests are germane to FWW as an organization that promotes safe and sustainable seafood for customers while simultaneously helping protect the environment and supporting the long-term well-being of coastal fishing communities. The plaintiffs have submitted FWW members' affidavits that detail their cognizable interests in the outcome of this litigation.

Although the parties contest the relevance of the plaintiffs' proffered expert Michael Sawyer, a determination of his opinion's value is irrelevant to the Court's resolution of the pending motion. To survive a motion to dismiss, the plaintiffs must allege facts that give rise to a plausible claim of standing. *See Cornerstone Christian Schools v. Univ. Interscholastic League,* 563 F.3d 127, 133–34 (5th Cir. 2009). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice," and the Court "presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130.

The plaintiffs have submitted sufficient factual allegations to give rise to a plausi-

ble claim of standing under the OCSLA. BP's alleged failure to maintain engineering documents required by DOI regulations creates an immediate and substantial risk to the plaintiffs' enjoyment of, and livelihood from, the Gulf of Mexico environment.[27]

### b. An Injury Fairly Traceable to BP's Conduct

To establish the second prong of standing, the plaintiffs must show that their threatened harm is "fairly traceable" to BP's actions. *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130. However, the plaintiffs are not required to show with "scientific certainty" that BP "caused the precise harm suffered by the plaintiffs" in order to show that an injury is "fairly traceable" to BP's actions. *See Save Our Comm.,* 971 F.2d at 1161. Instead, the "plaintiffs need only show that there is a 'substantial likelihood' that defendant's conduct caused [or could cause] plaintiffs' harm." *Powell Duffryn Terminals, Inc.,* 913 F.2d at 72 (internal citation omitted).

BP's alleged failure to maintain engineering documents required by MMS regulations creates a substantial likelihood that the plaintiffs' threatened harm will become a reality.[28] BP's alleged noncompliance introduces incalculable levels of risk to the Gulf of Mexico environment. As such, BP's alleged violations of MMS regulations requiring "as-built" and other specified types of engineering documentation is fairly traceable to the plaintiffs' threatened harm.

### c. Redressability

The third prong of standing requires that a plaintiff's injuries be capable of redress by the requested relief. *Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130. Requiring BP to halt production at Atlantic until compliance is verified would redress the plaintiffs' alleged harm because BP's alleged violations of OCSLA and MMS regulations create an impermissible, inherent risk of an incident at Atlantis. Until the risk of such an incident can be remedied, prohibiting production at Atlantis ensures protection of the environment and thereby of the plaintiffs' interests. Therefore, plaintiffs have demonstrated standing sufficient to withstand BP's lack of standing claim.

### 3. Injunctive Relief

 The Court denies BP's Rule 12(b)(6) motion with respect to injunctive

---

27. Two other circuit courts have found similar allegations sufficient to confer standing under the OCSLA. First, the D.C. Circuit determined that an environmental group could have standing to bring a citizen suit under the OCSLA where the particularized interest was enjoyment of the indigenous animals of Alaskan areas in a leasing program. *Ctr. for Biological Diversity v. United States DOI,* 563 F.3d 466, 479 (D.C.Cir.2009). That court determined that the DOI's adoption of an irrationally based leasing program could cause a substantial increase in the risk to the plaintiff's members' enjoyment of the animals affected by the offshore drilling and that setting aside the lease would redress the harm. Second, the First Circuit found that an environmental group could have standing to bring an OCSLA citizen suit action where its members alleged that they "depend[ed] upon the fishing resources and marine environment of

Georges Bank ... for food, recreation, scientific study, and commercial benefits." *Conservation Law Foundation of New England, Inc. v. Secretary of Interior,* 790 F.2d 965, 969 (1st Cir.1986).

28. Although the plaintiffs' proffered expert Sawyer's report is contested, his report adds credence to this fair traceability: "In reasonable engineering probability, a failure and catastrophic release will occur from BP Atlantis. No one can predict with any defined certainty the exact date of occurrence of an incident aboard BP Atlantis, yet, based on BP's failure to control integration of its subsea designs and flagrant use of inaccurate engineering data, time is of essence. The hazardous conditions are all in place; a small process upset or the need to adjust to hurricane conditions, could trigger a catastrophic release at any time."

relief. The elements required for injunctive relief are:

> (1) a substantial likelihood that [the plaintiff] will prevail on the merits, (2) a substantial threat that [the plaintiff] will suffer irreparable injury if the injunction is not granted, (3) [the plaintiff's] threatened injury outweighs the threatened harm to the party whom [the plaintiff] seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.

*Lake Charles Diesel, Inc. v. General Motors Corp.,* 328 F.3d 192, 195 (5th Cir.2003) (citing *Canal Auth. v. Callaway,* 489 F.2d 567, 572 (5th Cir.1974)). Based on the claims raised in the amended complaint, factual support exists for each element.

As to the first element, the underlying question is whether BP maintains the requisite engineering documentation. The plaintiffs allege with specificity the factual basis underlying BP's purported regulatory violations concerning BP's subsea engineering documentation database. Taking these facts as true, the plaintiffs will prevail on the merits. As to the second element, taking the plaintiffs' allegations as true, the longer that Atlantis remains operative without statutorily required engineering documents, the greater the risk exists that an accident could occur. As to the third element, the threatened damage to the Gulf Coast quite clearly outweighs the threatened damage to BP. Furthermore, BP would likewise suffer monetary injury from a potential oil spill.

As to the final element, the Gulf Coast environment sustains unique wildlife and aesthetic beauties, and thousands of people rely on it for income. Further destruction of the Gulf by a spill or other incident at Atlantis would undoubtedly affect the public interest in a dramatically negative manner. Moreover, an incident at Atlantis could result in the permanent closure of the facility. While the Court appreciates the national interests in being able to drill for and produce oil and gas in the Gulf, the permanent loss of a producing oil and gas facility would cause a greater economic impact to the public than prohibiting production for the duration of time it takes for BP to comply with the relevant regulations.

## VI. Conclusion

Based on the foregoing discussion, the Court denies BP's motion to dismiss in its entirety.

It is so **ORDERED.**